## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOMA LINDA UNIVERSITY MEDICAL CENTER
24890 Tulip Avenue
Loma Linda, California 92354,

        Plaintiff,

    v.

MICHAEL O. LEAVITT, Secretary,
United States Department of Health and Human
Services
200 Independence Avenue, S.W.
Washington, DC  20201,

        Defendant.

Civil Action No.

**COMPLAINT FOR REVIEW OF
AGENCY ACTION**

## I. INTRODUCTION

1.     This is an action for judicial review of a final decision of the Secretary of the

Department of Health and Human Services ("Secretary") denying Medicare payments to plaintiff

Loma Linda University Medical Center ("Loma Linda") for costs incurred from 1998 through

2000 in connection with Loma Linda's approved residency training programs.  The Medicare

payments at issue are payments for direct graduate medical education ("DGME") costs and

indirect medical education ("IME") costs associated with Medicare managed care enrollees.  In

administrative proceedings before the agency, the Secretary denied DGME and IME payments

with respect to Loma Linda's discharges of Medicare beneficiaries who were enrolled in

Medicare managed care plans, also referred to as "health maintenance organizations" ("HMOs").

The Secretary's decision was contrary to law and should be reversed.

2.     In 1997, Congress amended the Medicare statute to provide for DGME and IME

payments with respect to hospital discharges of Medicare beneficiaries enrolled in Medicare

HMOs. Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)). The 1997 legislation also required the Secretary to collect from the contracted Medicare HMOs data regarding inpatient hospital services. This data is sufficient for calculating the DGME and IME payments to teaching hospitals. Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)). In contravention of those statutes the Secretary denied the DGME and IME payments at issue because he determined that Loma Linda was late in furnishing claims for payment to its appointed fiscal intermediary.

3.      However, Loma Linda was timely in its submission of claims for payment since no time limit for claims submission existed. The Secretary's interpretation that a time limit existed was arbitrary, capricious or not in accordance with law. In addition, the Secretary's interpretation that the timeframe indicated in 42 C.F.R. § 424.44 applies to support denial of the DGME and IME claims at issue is invalid because such interpretation would be a substantive rule for which the Secretary failed to comply with notice and comment rulemaking under the APA. Lastly, Loma Linda could avail itself of Medicare's statutory exception allowing for the submission of late claims. *See* 42 C.F.R. §424.44(b).

4.      For the foregoing reasons, Loma Linda requests the Court set aside the Secretary's final decision in this case and direct the Secretary on remand to accept Loma Linda's alternative data with respect to DGME and IME payments for enrollees of Medicare's HMO program and reimburse Loma Linda accordingly for the periods at issue.

## II. JURISDICTION AND VENUE

5.      This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* and the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*

6.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

7.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

- 2 -

## III. PARTIES

8.    The plaintiff is Loma Linda University Medical Center, a general acute care teaching hospital that operates in Loma Linda, California, and participates in the Medicare program as a "provider of services."

9.    Defendant Michael O. Leavitt (hereinafter "Secretary") is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. The Secretary is responsible for the administration of the Medicare program. The Secretary exercises the administrative responsibility of the Medicare program primarily through the Centers for Medicare and Medicaid Services ("CMS," also formerly known as the Health Care Financing Administration), an agency of HHS. The Secretary also contracts with private organizations, and, in this instance, Blue Cross and Blue Shield Association and its subcontractors, Health Care Service Corporation and, subsequently, National Government Services LLC (collectively referred to herein as the "Fiscal Intermediary"), to act as fiscal intermediaries for the Medicare Program.

## IV. MEDICARE PAYMENT, COST REPORTING AND APPEALS PROCESS

10.    The Medicare Act establishes a system of health insurance for the aged and the disabled. Under the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his or her behalf for, *inter alia*, inpatient and outpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a "provider of services."

11.    Pursuant to 42 U.S.C. § 1395cc, Loma Linda entered into a written agreement with the Secretary to provide hospital services to eligible individuals.

12.    Under 42 U.S.C. § 1395x(v)(1)(A), providers of inpatient hospital services, such as Loma Linda, are entitled to payment from Medicare for their "reasonable costs" incurred in

providing services to Medicare patients, in accordance with regulations adopted by the Secretary.

Reasonable cost is defined as the "cost actually incurred, excluding therefrom any part of

incurred cost found to be unnecessary in the efficient delivery of needed health services, and

shall be determined in accordance with regulations establishing the method or methods to be

used, and the items to be included, in determining such costs for various types or classes of

institutions, agencies, and services." 42 U.S.C. § 1395x(v)(1)(A).

13.    In adopting regulations, the statute requires the Secretary to "take into account

both direct and indirect costs of providers or services . . . in order that, under the methods of

determining costs, the necessary costs of efficiently delivering covered services to individuals

covered by [Medicare] will not be borne by individuals not so covered." *Id.*

14.    Effective with cost reporting years beginning on or after October 1, 1983,

Congress adopted a prospective payment system ("PPS") to reimburse hospitals, such as Loma

Linda, for inpatient hospital operating costs. *See* 42 U.S.C. § 1395ww(d). Effective with cost

reporting years beginning on or after October 1, 1991, a complementary PPS process was

implemented to reimburse hospitals, such as Loma Linda, for inpatient hospital capital-related

costs. *See* 42 U.S.C. § 1395ww(g).

15.    CMS, through fiscal intermediaries, pays providers participating in the Medicare

program for covered services rendered to Medicare beneficiaries. 42 U.S.C. § 1395h. The

amount of payment owed to a provider for services furnished to Medicare beneficiaries is

determined by the fiscal intermediary acting as an agent of the Secretary. 42 U.S.C. § 1395h.

16.    Typically, when a Medicare fee-for-service enrollee presents at a participating

provider, the enrollee submits a Medicare card containing the enrollee's name, birth date, sex

and unique Health Insurance Claim ("HIC") number. The provider then uses that information on

the claims it submits to the fiscal intermediary.

17.    A claim must include the enrollee's HIC number.

18.    The claims information is entered into a Provider Statistical & Reimbursement ("PS&R") system that generates reports for use at the end of the fiscal year to analyze and audit providers' claimed costs.

19.    At the end of the fiscal year, the hospital must submit a cost report showing the costs incurred by it during the fiscal year and the appropriate portion of those costs to be allocated to Medicare.  42 C.F.R. §§ 413.24, 413.50.  The hospital must submit its cost report in compliance with law.

20.    A hospital must explain any variances between the hospital's cost report and the PS&R.

21.    After completion of the fiscal intermediary's audit, the fiscal intermediary issues a Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its Medicare reimbursement for the cost reporting period in compliance with law.

22.    A hospital has a right to obtain a hearing before the Provider Reimbursement Review Board ("PRRB") by filing an appeal with the PRRB within 180 days of receiving its NPR if the provider "is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1886" of the Medicare Act.  *See* 42 U.S.C. § 1395oo(a)(1)(A)(2).  The PRRB has jurisdiction over appeals from the Secretary's determinations if the provider is dissatisfied with the Secretary's final determination, the amount in controversy is equal to $10,000 or more, and the provider requests a hearing within 180 days after notice of the Secretary's determination.  42 U.S.C. § 1395oo(a); *see also*, 42 .C.F.R. §§

405.1837, 405.1839(b).

23.    The Secretary, through the Administrator of CMS ("Administrator")[1], may elect to reverse, affirm, or modify the decision of the PRRB. 42 U.S.C. § 1395oo(f).

24.    Providers "have the right to obtain judicial review of any final decision of the PRRB, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the PRRB or of any reversal, affirmance, or modification by the Secretary is received." 42 U.S.C. § 1395oo(f).

## V. MEDICARE PAYMENT FOR DGME AND IME ACTIVITIES FOR SERVICES FURNISHED TO MEDICARE HMO ENROLLEES

25.    In addition to the payments for inpatient and outpatient services under the PPS, the Medicare program pays hospitals for direct costs associated with DGME and IME costs. 42 U.S.C. § 1395ww(h)(4)(E); 42 C.F.R. §§ 412.50, 413.86 (the regulation was recodified effective October 1, 2004 as 42 C.F.R. §§ 413.75-413.83); 42 U.S.C. § 1395ww(d)(5)(B)(iv).

26.    Since 1983, section 1886(d)(5)(B) of the Medicare Act provided that prospective payment hospitals that have residents in an approved graduate medical education program receive an additional payment for a Medicare discharge to reflect the higher patient care costs of teaching hospitals relative to non-teaching hospitals (known as the IME adjustment). Since 1985, section 1886(h) of the Medicare Act provided a methodology for determining payments to hospitals for the costs of approved graduate medical education training programs (known as the DGME payment).

27.    In 1997, Congress greatly expanded the number of Medicare HMO plans under a system then called Medicare+Choice, or Medicare Part C. As a result of the implementation of

---

[1] The Administrator oversees the development of policies, standards and guidelines; evaluates progress in the administration of CMS programs; ensures that required actions are taken to direct or redirect efforts to achieve program objectives; and works with the States, other Federal agencies and other concerned nongovernmental organizations in administering health care financing programs.

Medicare Part C, PPS hospitals no longer received DGME or IME payments for Medicare enrollees who had enrolled with a Medicare HMO plan. Instead, the DGME and IME payments that had under PPS gone directly to the treating teaching hospitals now, under Part C, went directly to health plans in the form of capitated payments.

28.    Concern that the DGME and IME payments for enrollees under Medicare Part C were not being forwarded by the Medicare HMO plans to the teaching hospitals led to proposals (and ultimately the enactment of law) under which Medicare would resume paying teaching hospitals directly for DGME and IME based on the number of Medicare HMO enrollees treated by the hospital. *See* Statement of Bruce C. Vladeck, Ph.D., Administrator of Health Care Financing Administration on "Graduate Medical Education" Before the Senate Committee on Finance (March 12, 1997).

29.    Sections 4622 and 4624 of the Medicare Balanced Budget Act of 1997 ("BBA") (codified as 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)), mandate that the Secretary make payment directly to participating Medicare hospitals for DGME and IME costs for Medicare HMO enrollees.

30.    Beginning on January 1, 1998, and throughout the 1998, 1999 and 2000 cost reporting periods at issue in this case, the DGME payment calculation provides for additional DGME payment to a teaching hospital with respect to patient days associated with Medicare beneficiaries who are enrolled in Medicare HMOs. 42 U.S.C. § 1395ww(h)(3)(D)(i)(II); 42 C.F.R. § 413.86(d).

31.    The governing Medicare regulation, 42 C.F.R. § 413.86(d)(3),[2] addresses DGME and provides that "[f]or portions of cost reporting periods beginning on or after January 1, 1998, the product derived in step one [i.e., the updated per resident amount] is multiplied by the

---

[2] Effective October 1, 2004, this regulation was split into nine individual sections. The current section is 413.76(c).

proportion of the hospital's inpatient days attributable to individuals who are enrolled under a
risk sharing contract with an eligible organization under section 1876 of the [Medicare] Act and
who are entitled to Medicare Part A or with a Medicare+Choice organization under Title XVIII,
Part C of the Medicare Act."

32.     Similarly, beginning January 1, 1998, and throughout the 1998, 1999 and 2000
cost reporting periods at issue in this case, the IME payment calculation considers estimated
average payments per discharge that would have been paid under the PPS for hospital discharges
of Medicare beneficiaries who were enrolled in an HMO when they received services from the
hospital.  42 U.S.C. § 1395ww(d)(11); 42 C.F.R. § 412.105(g).

33.     The additional IME payments provided with respect to teaching hospitals'
discharges of Medicare HMO enrollees were to be phased in gradually over a five-year period in
which like amounts were to be removed from the capitation rates paid by the Secretary to the
Medicare HMOs.  42 U.S.C. §§  1395ww(d)(11)(C), 1395ww(h)(3)(d)(ii), 1395w23(a)(3)(B)-
(C); 42 C.F.R. § 422.254(c) and (e)(2).

## VI.  REQUIREMENTS REGARDING SUBMISSION OF DATA UNDER THE BALANCED BUDGET ACT OF 1997 AND IMPLEMENTATION OF PROVISIONS

34.     In the BBA, Congress directed the Secretary to require the Medicare HMO
contractors to submit data, and any other information the Secretary deemed necessary, regarding
inpatient hospital services furnished to Medicare HMO enrollees.  Pub. L. No. 105-33, § 4001
(codified at 42 U.S.C. § 1395w-23(a)(3)(B)).

35.     In the preamble to a final rule in the Federal Register on August 29, 1997, the
Secretary acknowledged that Congress had amended the Medicare Act to provide for DGME and
IME payments with respect to Medicare HMO enrollees, that Congress required the Secretary to
collect necessary data from the contracted HMOs to implement adjustments to the capitation

rates paid to them, and that the agency was "considering the data requirements necessary to implement both the direct and indirect medical education and [Medicare HMO] risk adjustment provisions." 62 Fed. Reg. 45965, 46007.

36.     In the preamble to a final rule published in the Federal Register on May 12, 1998, the Secretary stated, "We anticipate teaching hospitals will need to submit claims associated with Medicare+Choice discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments."  63 Fed. Reg. 26318, 26342.  The Secretary did not adopt such requirement in that rule or make reference to any other statutory provisions that would apply to the methodology or processes with respect to the DGME or IME payments.

37.     On June 26, 1998, CMS published notice of an interim final rule in the Federal Register, and adopted a regulation, requiring Medicare HMOs to submit hospital encounter data to the Medicare fiscal intermediaries for each Medicare HMO's own enrollees.  63 Fed. Reg. 34968, 35092 (June 26, 1998).  The regulation, codified at 42 C.F.R. § 422.257(a), provides:

> Each M+C organization must submit to CMS (in accordance with CMS instructions) all data necessary to characterize the context and purposes of each encounter between a Medicare enrollee and a provider, supplier, physician, or other practitioner.

38.     The June 1998, rule further provides that the Medicare HMOs' submission of this data to the fiscal intermediaries must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate." 42 C.F.R. § 422.257(d).

39.     The Secretary further clarified in the preambles to the 1998 interim final rule and a later rule that the Medicare HMOs were required to submit hospital encounter data to the fiscal intermediaries on the same form (UB-92) and in a format that is "identical" to the form and format of hospital claims for payment to the intermediaries, because "pricing of discharges" of

- 9 -

Medicare HMO enrollees would be required to recalibrate the capitation payments made by CMS to the Medicare HMOs. 63 Fed. Reg. at 35006; 65 Fed. Reg. 40170, 40249 (June 29, 2000).

40.    In July 1998, CMS issued a program memorandum ("the Program Memorandum") regarding the provision for additional DGME and IME payments with respect to discharges of hospital patients enrolled in Medicare HMOs. Program Memorandum (Intermediaries), HFCA Pub. 60-A, Trans. No. A-98-21 (Jul. 1, 1998).

41.    The Program Memorandum was addressed to the Medicare fiscal intermediaries. The Program Memorandum principally addressed "intermediary and standard system changes needed" to provide DGME and IME payments with respect to Medicare HMO enrollees. *Id*.

42.    The Program Memorandum instructed the fiscal intermediaries to notify providers, such as Loma Linda, within 3 business days after the fiscal intermediaries' receipt of the Program Memorandum, that: "Teaching hospitals may submit bills for inpatient status by HMO enrollees for payment." *Id.* The Program Memorandum did not instruct the fiscal intermediaries to give hospitals notice that they must submit claims to the fiscal intermediary in order to receive DGME and/or IME payments with respect to hospital discharges of Medicare HMO enrollees.

43.    The Program Memorandum did not instruct the fiscal intermediaries to give hospitals notice as to any required time period for submission of claims to the fiscal intermediaries in order to receive DGME and/or IME payments with respect to hospital discharges of Medicare HMO enrollees.

44.    The Program Memorandum was not published for notice and comment in the Federal Register.

45.    Loma Linda never received a copy of the Program Memorandum issued by the CMS.

46.    Loma Linda first learned a procedure to bill for DGME and IME directly with its intermediary after its Fiscal Intermediary issued Bulletin 416, dated July 13, 1998 ("the Bulletin").

47.    The Bulletin instructed that "[f]or services provided to Medicare+Choice beneficiaries, beginning with discharges on or after July 1, 1998," teaching hospitals like Loma Linda "may submit bills for inpatient stays by managed care enrollees for payment of IME." After further discussion about the submission of claims and the coding that should be included on them, the Bulletin summarized the instructions with respect to "risk members" (i.e., enrollees of the Medicare HMO program) as follows: "teaching hospitals to submit bills to regular intermediary for IME payments (condition codes 04 and 69) and may submit HMO paid bills to the six specified intermediaries for encounter and utilization purposes."

48.    The Bulletin did not instruct providers as to what process for billing the DGME and/or IME claims should be followed for claims before June 30, 1998.

49.    The Bulletin did not provide any instruction as to claims for DGME payments; it only addressed claims for IME payments.

50.    In the preamble to a final rule published in the Federal Register on June 29, 2000, the Secretary responded to comments regarding the June 1998, interim final rule, discussed above, and the submission of encounter data regarding hospital discharges of Medicare HMO enrollees. 65 Fed. Reg. 40170, 40249.

51.    In his response to those comments, the Secretary acknowledged a "range of problems in the submission of encounter data," including fiscal intermediary processing

problems and confusion regarding hospital submission of encounter data. 65 Fed. Reg. at 40249.

52.    In order to address some of those problems, the June 2000, rule established a retrospective reconciliation process for encounter data that was submitted late by the Medicare HMOs to the Part A fiscal intermediaries. *See* 65 Fed. Reg. at 40250; see also 42 C.F.R. § 422.257(g)(2).

53.    This reconciliation process was established to allow the Medicare HMOs the benefit of appropriately recalibrated capitation payment rates that take into account all the relevant available encounter data concerning hospital discharges of Medicare HMO enrollees, including data that was untimely submitted by the Medicare HMOs to the fiscal intermediaries. *See* 65 Fed. Reg. at 40250.

54.    An extension for the submission of claims is allowed by statute if certain conditions are met. 42 C.F.R. Section 424.44 provides that timeframes for submitting Medicare claims for payments may be extended due to error or misrepresentation:

> Section 424.44(b): Extension of filing time because of error or misrepresentation.
>
> (1) The time for filing a claim will be extended if failure to meet the deadline . . . was caused by error or misrepresentation of an employee, intermediary, carrier, or agent of the Department that was performing Medicare functions and acting within the scope of its authority.

55.    CMS Pub100-4, Section 70.7 provides for an exception if there is an "administrative error."

56.    CMS Pub100-4, Section 70.7.1 then provides several "standard" exceptions, including that "The failure resulted from excessive delay by Medicare, the [Fiscal Intermediary], or the carrier in furnishing information necessary for the filing of the claim."

57.    Section 70.7.1 also states that:

> Any claim involving situations other than those listed above, where it appears that an extension of the time limit might be justified on the basis of administrative error, should be submitted by the FI with a recommendation, before payment, to the appropriate CMS RO. Also, any claim, whether involving the situations listed above or others, in which administrative error prevented timely filing until after the close of the third year following the year in which the services were furnished (fourth year, in the case of services furnished in the October – December quarter) should be submitted to the appropriate CMS RO for advice before denial action.

Section 70.7.1 goes on to state that, "At CMS' discretion, consideration of such allegations [of administrative error] may not be limited to the three or four year period described above."

### VII. FACTS SPECIFIC TO THIS CASE

58.    The periods at issue are Loma Linda's cost reporting periods ending December 31, 1998, December 31, 1999, and December 31, 2000.

59.    During the cost reporting periods at issue, Loma Linda operated a general acute care teaching hospital that qualified for DGME and IME payments.

### A.    Loma Linda's Submission of Claims for Payment to Its Fiscal Intermediary and Its Inability to Obtain HIC Numbers for Medicare HMO Enrollees.

60.    The Medicare claims adjudication system does not allow a claim to be entered without the HIC number.

61.    The HIC number is issued by the Medicare program to identify the patient as a Medicare enrollee.

62.    The established process for the billing of services furnished to Medicare fee-for-service enrollees, i.e., beneficiaries not enrolled with a Medicare HMO, involves two steps: First, the Medicare fee-for service enrollee presents her "Medicare Red White and Blue Card," ("Medicare Card") which contains the enrollee's name, birth date, sex and unique HIC number. Second, the hospital uses the enrollee's unique HIC number to bill Medicare for services

provided to the enrollee.

63.    An identical process is utilized for Medicare HMO enrollees except that when a Medicare HMO enrollee presents at the hospital for services, she presents her insurance card ("Insurance Card") issued by the Medicare HMO instead of the "Medicare Red White and Blue Card."

64.    The Insurance Card is required to identify a patient as an enrollee of the Medicare HMO plan.

65.    The Insurance Card reflects an insurance or policy number specially designated for the enrollee by the HMO but does not include Medicare's own HIC number.

66.    Medicare HMO enrollees are directed by their HMOs that presentation of their Insurance Cards is all that is required to obtain services from a participating hospital.

67.    The Secretary also does not require Medicare HMO enrollees to present their HIC numbers to a provider.

68.    Loma Linda encountered much difficulty in trying to obtain HIC numbers from Medicare HMO enrollees.

69.    Loma Linda initially tried to obtain the Medicare HMO enrollees' HIC numbers by requesting them from the enrollees at the registration process, but these efforts were often resisted.  In some instances, the Medicare HMO enrollees told Loma Linda that their Medicare HMO plan had instructed them not to present their Medicare identification card and not to disclose their HIC numbers to the hospital because of issues with fraud or double billing.

70.    This attitude on the part of numerous enrollees with respect to fraud and double billing was consistent with statements that the Medicare program had placed on its explanation of benefits in the 1988-2000 period advising enrollees to be alert to fraudulent or "double"

billing.

71.    Further efforts to obtain the HIC numbers for Medicare HMO enrollees included the development and mailing of a form letter which asked the enrollees to furnish their HIC numbers after explaining why their HIC numbers were required. Many of these requests were ignored.

72.    Loma Linda also attempted to obtain the missing HIC numbers by using the Common Working File ("CWF").[3] Nevertheless, there were many Medicare HMO enrollees whose HIC number could not be obtained from the CWF because many of the beneficiaries during this period, and in particular many of the women beneficiaries, had never worked and thus had not paid into the Social Security program. As a result their Social Security number did not match their HIC numbers, which instead was the Social Security number of their sponsor who had worked and thereby obtained eligibility for Medicare benefits.

73.    Some of Loma Linda's efforts to obtain the missing HIC numbers paid off and Loma Linda was able to properly bill for those claims.

74.    In seeking further resolution of the problem, the supervisor of Loma Linda's Medicare Billing Unit from 1985 through 2000 called Loma Linda's Fiscal Intermediary to inquire as to how the situation could be remedied. Instead of addressing Loma Linda's concerns, the Fiscal Intermediary merely responded that if Loma Linda wanted to be paid, it would have to bill the Fiscal Intermediary using the HIC number.

75.    The problem with obtaining the HIC numbers of Medicare HMO enrollees still exists today, and is wide-spread among teaching hospitals nationwide.

---

[3] "The ... CWF is a single data source for fiscal intermediaries and carriers to verify beneficiary eligibility and conduct prepayment review and approval of claims from a national perspective. It is the only place in the fee-for-service claims processing system where full individual beneficiary information is housed. " *See* U.S. Department of Health & Human Services, Exhibit 300 (BY2009) - CMS CWF, http://www.hhs.gov/ocio/capitalplanning/exhibit300/FY09Exhibit300/cmscommonworkingfilecwf.html.

B.    **Price Fass Company's Detection of Discrepancies and Loma Linda's Provision of Data Sufficient to Calculate DGME and IME Payments.**

76.    The full scope of the problem with obtaining the HIC numbers was discovered in early 2003 when Loma Linda hired Medicare reimbursement consultants Price Fass and Company ("PFC") to develop a contractual allowance template so Loma Linda could estimate its financial liabilities and receivables to Medicare. While working on this project PFC discovered a discrepancy between Loma Linda's internal records of the number of Medicare HMO discharges and Loma Linda's PS&R showing the Medicare HMO discharges for which Loma Linda billed the Fiscal Intermediary for DGME and IME payments.

77.    PFC prepared reports that identified the scope of the discrepancy for fiscal years 1998, 1999 and 2000.

78.    PFC next recommended that Loma Linda submit data showing the unbilled Medicare HMO discharges to its Fiscal Intermediary so that the DGME and IME payments could be identified for reimbursement through the cost report.

79.    Loma Linda's data was sufficient for the Fiscal Intermediary to calculate DGME and IME payments because it included all the necessary items of data for both DGME and IME payments.

80.    The four items of data required for the calculation of the DGME payment, which Loma Linda submitted to its Fiscal Intermediary, included the following: (1) total Medicare days, (2) total hospital days, (3) intern and resident Full-Time-Equivalent days, and (4) hospital-specific per-resident amounts.

81.    The three items of data required for the calculation of the IME payment, which Loma Linda submitted to its Fiscal Intermediary, included the following: (1) the DRG amount for the discharge, (2) the number of intern and/or resident Full-Time-Equivalent days that qualify

for the IME formula, and (3) the number of qualifying beds.

82.     Loma Linda believed it could submit the required data in alternative format based on the Fiscal Intermediary's own instructions to Loma Linda dated April 22, 1999, advising Loma Linda that it could supplement the PS&R with the hospital's own data: "Although the use of this PS&R is not mandatory, it is generally expected that the majority of providers must rely on the PS&R in completing specific cost report worksheets. . . . However, in certain instances you may elect to use your records in part or in total in filing the cost report . . . . Additionally, you may cite PS&R inaccuracies and substitute your records, in part, or in total."

83.     The same instruction is found in the Fiscal Intermediary's May 2, 2002, letter to Loma Linda.

84.     In other areas pertaining to reimbursement, Medicare has accepted data in a form other than what was required.

85.     For example, with respect to reimbursement for Medicare Disproportionate Share payments, CMS changed its practice of accepting only Medicaid paid claims reports and began to accept the hospital's own data to document Medicaid eligible days.

86.     Similarly, for the purpose of showing qualification for special payment adjustments under the PPS for Medicare-dependant small rural hospitals ("MDH payments"), the Secretary has accepted non-bill data to identify the number of Medicare HMO patient days that would support the MDH payment.

87.     PFC prepared a log for fiscal year 2000 containing all the information the Fiscal Intermediary needed to calculate the DGME and IME amounts for the year. Although a similar log for fiscal years ending in 1998 and 1999 could also be created, PFC chose to create the log for fiscal year 2000 because fiscal years 1998 and 1999 had already been audited. Also, fiscal

year 2000 was scheduled for audit, and the Fiscal Intermediary's application of the log to 2000 would inform Loma Linda about the approach to take to 1998 and 1999.

88.    Loma Linda submitted the data required for DGME and IME payment to its Fiscal Intermediary by letter dated February 27, 2003.

89.    The complete 2000 log was enclosed with the February 27, letter and contained sufficient information for the Fiscal Intermediary to calculate the DGME and IME costs for fiscal year 2000.

90.    Loma Linda also requested in its letter that the Fiscal Intermediary advise Loma Linda if additional information was required.

91.    The Fiscal Intermediary responded by letter dated May 17, 2003, in which it stated that it could not accept the data and make the requested payments through the cost report settlement process. Instead, "[i]n order to receive IME payment add-on for Medicare HMO claims, the provider must bill for these claims."[4]

92.    The Fiscal Intermediary also wrote that it had no authority to grant a waiver for the submission of a late claim, and that Loma Linda should apply to the CMS regional office in San Francisco for such a waiver.

93.    The Fiscal Intermediary did not address the adequacy of the data Loma Linda submitted to support DGME and IME payments.

94.    Loma Linda also amended its 2000 cost report with the same information supporting its February 27, request for DGME and IME payments. The Fiscal Intermediary rejected the data in the amended cost report supporting the additional DGME and IME payments, but did incorporate some other data from the amended cost report in its audit of fiscal year 2000.

95.    On behalf of Loma Linda, PFC e-mailed Gary Terada of CMS to request the

---

[4] The Fiscal Intermediary did not refer to the claims for DGME payments in his response.

waiver noted in the Fiscal Intermediary's May 17, letter.

96.    Mr. Terada responded on May 23, that the request for "good cause" for the submission of late bills had to be made to the Fiscal Intermediary, and not CMS. Mr. Terada stated that good cause for the filing of late claims would include a situation in which "the provider was given incorrect information by the [Fiscal Intermediary], Medicare, etc."

97.    Based on the Fiscal Intermediary and CMS both refusing to accept the offered data, and both refusing to accept responsibility to make a decision as to whether there was good cause to accept late bills, Loma Linda concluded that the issue would have to be resolved through the appeals process.

## C.    The Decision of the Provider Reimbursement Review Board.

98.    The issue before the PRRB was whether the Fiscal Intermediary and the Secretary should have accepted Loma Linda's data, subject to verification, that demonstrated it was entitled to receive DGME and IME payments for Medicare HMO enrollees for fiscal years ending on December 31, 1998, 1999, and 2000.

99.    After a hearing on February 15, 2006, the PRRB issued its Decision dated May 9, 2008, in favor of Loma Linda. It reversed the Fiscal Intermediary's denial of DGME and IME payments with respect to Loma Linda discharges of Medicare HMO enrollees for three primary reasons.

100.    First, the PRRB reasoned that since "CMS did not make a change to the regulation at 42 C.F.R. § 424.30 that exempts filing a claim with the Intermediary if the payment arises from services furnished on a capitation basis, . . ." providers, therefore, "could not be required to file a separate claim for IME/DGME payments with the intermediary."

101.    The PRRB explained that "[w]hen 42 C.F.R. § 424.30 governing claims filing was implemented, there was no contemplation of or any need for a 'claim for payment' other

than the claim to obtain payment for the inpatient services furnished to the beneficiary." Since

no change was implemented with respect to the nature of the payment for "services furnished"

following the authorization in the BBA '97 of the additional payment for DGME and/or IME,

such payment "arises from 'services . . . furnished on a . . . capitation basis . . .' for which filing a

claim with the intermediary is excepted under 42 C.F.R. § 424.30."

102.    The PRRB continued that although the Secretary had been given "extremely

broad authority to implement procedures for payment . . . once the system was established by

regulation linking the obligation to file an intermediary claim with the method of payment,

CMS' effort to impose a contrary claims filing requirement via guidance in an Administrative

Bulletin [was] insufficient to deprive a provider of its statutory right to payment." Any

bifurcation of the "regulatory obligation to file a 'claim' . . . so that a provider has an obligation

to file its claim for payment of services to the beneficiary with the HMO and to also file a

virtually identical claim to the Intermediary," the PRRB concluded, required regulatory notice.

103.    Second, the PRRB determined that even if CMS could implement the claims

requirement without regulatory change, the provider would have been entitled to an exception to

the deadlines for filing claims because the instructions were misleading in multiple ways

including whether the Provider could submit claims before June 30, 1998, whether the filing of

the claims at issue was absolutely required for payment, and whether the requirement for filing,

if any, applied only to IME claims (and not DGME claims).

104.    Third, the PRRB found that the Provider would also have been entitled to an

exception to the deadlines because "the process established by CMS had a significant error in

that providers were required to submit a HIC number to claim reimbursement but that no

effective mechanism or methodology was established to allow providers to obtain HIC numbers

by requiring patients, HMOs or the Intermediary to provide the HIC numbers to providers."

105.    One member of the PRRB dissented.

106.    The dissent relied on CMS' publication of Transmittal A-98-21 issued on July 1, 1998, (earlier identified as "the Program Memorandum") in finding that Loma Linda had "adequate time to comply with CMS' instructions regarding the submission of the specially coded UB-92 claim forms." The dissent did not address the fact that Loma Linda testified as to not having received this publication.

107.    The dissent also did not address the inadequacies of the Bulletin, which Loma Linda actually received, and which was discussed by the majority.

108.    The dissent did not address the application of 42 C.F.R. § 424.30 *et seq*. to the DGME and IME claims at issue in its historical context or provide a rebuttal to the explanation provided by the majority. Instead, after quoting the regulation, the dissent concluded that "the regulatory exception for filing claims does not apply to the specially coded UB-92s required for payment of the additional IME and GME reimbursement because they were claims for additional reimbursement for the hospitals' costs associated with being teaching hospitals and not for services furnished by any of the aforementioned health plans on a prepaid capitation basis."

109.    The dissent addressed the issue of Loma Linda's inability to obtain the necessary HIC numbers by stating that the record showed that the Provider also failed to file claims for which it had the HIC number. The page of the Transcript cited by the dissent (134) for this proposition, however, in light of the immediately following testimony of the witness stating no knowledge of whether that was the case, fails to verify this statement.

**D.    The Submission of Comments to the Administrator**

110.    Upon the Administrator's decision to review the PRRB's decision, 42 U.S.C. § 1395oo(f), CMS' Center for Medicare Management ("CMM") submitted comments requesting a

reversal of the PRRB's decision, and Loma Linda provided comments requesting that the PRRB's decision be affirmed.

111.    CMM contended that the preamble of the May 12, 1998, final rule provided "explicit notice" to hospitals that they would be expected to submit Medicare HMO claims to the Fiscal Intermediary for DGME and IME payment purposes under part A, in addition to the bills submitted to HMO plans for payment under Part C. It did not address Loma Linda's contention that this "explicit notice" merely anticipated changes and did not provide final notice.

112.    CMM also argued that "the Provider could not explain why in a number of instances, where HIC numbers were readily available, the Provider also did not submit UB-92s for those claims." CMM did not cite a source for this conclusion.

113.    CMM also stated that Loma Linda's request that CMS accept its data to calculate the DGME and IME payments at issue "would require a substantial effort on the part of the Intermediary . . . ."

114.    Loma Linda argued in its comments that the Secretary never issued a rule establishing a timeframe in which a teaching hospital had to submit bills to its Fiscal Intermediary in order to obtain DGME and/or IME payment for Medicare HMO enrollees.

115.    Loma Linda also contended that none of the documents relied upon by the Secretary ever identified a billing process that existed under current regulations, or asserted that any existing regulations were applicable to the process they identified and that, further, none of the documents identified a time limit in which the bills had to be submitted to the Intermediary.

116.    Loma Linda argued that, even if the Secretary had issued an "interpretation" that Part 42 of the C.F.R. applied to Part C services, it would have been invalid in light of the history of the DGME and IME payments, the creation of Part C, and Congress' transfer of the recipients

of DGME and IME payments for Part C services from plans to teaching hospitals, which make clear that the DGME and IME payments for Medicare HMO enrollees are all for Part C services.

117.    Loma Linda pointed out that the Secretary's "interpretation" would also have been invalid since the rule is a substantive rule that requires adherence to notice and comment procedures under the APA, which the Secretary did not follow.

118.    Loma Linda contended that the Secretary's billing "rule" was arbitrary, capricious, an abuse of discretion, and not in accordance with the law because by not implementing a method by which providers like Loma Linda could obtain the Medicare HMO enrollee's HIC number, he failed to provide a workable process through which providers could comply with the billing rules.

119.    Finally, Loma Linda argued that its data, which was sufficient for demonstrating its entitlement to the DGME and IME payments at issue, should have been accepted by the Fiscal Intermediary since providers' alternative data had been accepted in other contexts and since an exception was allowed for "administrative error."

E.    **The Administrator's Reversal of the PRRB's Decision.**

120.    After review of the PRRB's decision and the submission of comments from both parties, the Administrator of CMS reversed the PRRB's decision overturning the denial of payments for DGME and IME costs with respect to Medicare HMO enrollees.

121.    The Administrator's decision constituted the Secretary's final determination on the issue in dispute for the cost reporting periods at issue.

122.    The Administrator appeared to categorize the DGME and IME claims at issue as Part A payments when he interpreted the applicability of 42 C.F.R. § 424.30 *et seq.* to the DGME and IME claims at issue as follows: "[W]hile claims for, *inter alia*, Part C and § 1876 managed care services are not controlled by this section, a hospital must submit claims in

conformity with 42 C.F.R. § 424.30 *et seq.*, to be able to include managed care enrollees for the Part A IME and DGME payments from its intermediary."

123.    Later in his decision, however, the Administrator retreated from this prior position by making the following statements: "The Administrator finds that, [sic] the statute did not set forth in detail the process by which a Provider was to receive payment for manage care enrollees. However, the provision for this payment for managed care enrollees is within the framework of a pre-existing methodology for IME and DGME payments."

124.    The Administrator linked the requirement of following the "preexisting methodology" by stating that "[b]ecause a claim was required to be filed, the regulatory requirement of 42 C.F.R. § 424.30 were controlling."

125.    The Administrator concluded as follows: "The claims in the instant case were claims that were required to be process [sic] under the claims processing system in order for payment to be made for an established reimbursement methodology for hospitals' costs associated with being a teaching hospital and not for the services furnished to a managed care enrollees [sic]."

126.    The Administrator did not find that CMS was required under the APA to publish a new regulation under the circumstances since "[t]he payment of IME and DGME claims was an already established payment methodology for teaching hospitals that was already linked to the claims processing system and did not require the promulgation through notice and comment of specific instructions."

127.    The Administrator responded to Loma Linda's argument regarding its inability to obtain many of the HIC numbers of the Medicare HMO enrollees by parroting the rebuttal offered by the PRRB's dissent that Loma Linda's witness could not explain why it did not file

some claims for which it had the HIC number. The source cited for this proposition, like the PRRB's dissent, did not consider the fact that the testimony immediately following the citation to the transcript stated the witness' lack of knowledge as to whether any of the "late" claims were claims for which Loma Linda had the enrollee's HIC number.

128.    The Administrator did not consider at any point whether the Secretary's implementation of a rule requiring compliance with 42 C.F.R. § 424.30 *et seq.* without also implementing a process through which a provider could obtain a Medicare HMO enrollee's HIC number, which is also required for compliance with those same rules, constituted a materially flawed decision.

129.    Other than discussing the importance of the UB-92 claim forms in the reimbursement process, the Administrator did not consider whether the Fiscal Intermediary should have accepted Loma Linda's data as an alternative to the UB-92 claim forms given that Loma Linda's data included the same information as provided on the forms.

130.    The Administrator's decision was sent to Loma Linda's counsel under cover of a letter dated July 9, 2008.

131.    Loma Linda's provider representative received that letter and the accompanying decision of the Administrator on July 15, 2008.

## VIII.  FIRST CLAIM FOR RELIEF

132.    Loma Linda realleges and incorporates by reference paragraphs 1 through 131 above.

133.    The Secretary's rejection of Loma Linda's data as proof of Loma Linda's entitlement to payment for the costs of DGME and IME is not in accordance with law because there is no rule establishing a timeframe in which a teaching hospital must submit those bills to its fiscal intermediary in order to obtain such payments.

134.    The Secretary primarily relied on three documents to support his conclusion that the provider had the information needed to bill its fiscal intermediary to obtain the DGME and IME payments for Medicare HMO enrollees: (1) the May 12, 1998, Federal Register, (2) the Program Memorandum, and (3) the Bulletin.

135.    Those documents do not provide a time limit for the submission of bills to the fiscal intermediary, contain no reference to a billing process that exists under current regulations, or assert that any existing regulations are applicable to the process identified by the Secretary.

136.    The Secretary is attempting to apply, *ex post facto*, rules contained in Part 42 of the C.F.R. that do not apply on their face and were never identified or incorporated in (1) the May 12, 1998, Federal Register, (2) the Program Memorandum, or (3) the Bulletin.

## IX.  SECOND CLAIM FOR RELIEF

137.    Loma Linda realleges and incorporates by reference paragraphs 1 through 136 above.

138.    5 U.S.C. § 706(2)(A) requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law …"

139.    The Secretary's denial of reimbursement to Loma Linda for DGME and IME should be reversed because it is arbitrary, capricious, an abuse of discretion and not in accordance with law (42 U.S.C. § 1395oo(f); 5 U.S.C. § 706) because:

A.    The Secretary failed to consider an important aspect of the billing problem by failing to provide a mechanism through which teaching hospitals like Loma Linda can obtain a Medicare HMO enrollee's HIC number;

B.    The Secretary failed in his duty to consider or adopt Loma Linda's data or the claims data submitted by risk HMOs as a reasonable alternative solution to the billing

problem.

        C.     The Secretary's application of the time limits in 42 C.F.R. Subpart C

(sections 424.30 through 424.45) to the DGME and IME payments at issue is inconsistent and

conflicts with existing law.  Pub. L. No. 105-33, §§ 4001, 4622 and 4624 (codified at 42 U.S.C.

§§ 1395w-23(a)(3)(B), 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).

        D.     The Secretary's duplicative billing requirement violates the Paperwork

Reduction Act, 44 U.S.C. § 3512(a), since the Secretary did not obtain the required approval for

a new requirement that teaching hospitals must submit unnecessarily duplicative payment claims

both to Medicare HMOs and to Medicare Part A fiscal intermediaries in order to receive the

DGME and IME payments due under the Medicare Act.

## X. THIRD CLAIM FOR RELIEF

     140.     Loma Linda realleges and incorporates by reference paragraphs 1 through 139

above.

     141.     The Secretary's "interpretation" that the timeframe indicated in 42 C.F.R. §

424.44 applies to support denial of the DGME and IME claims at issue is invalid because such

interpretation would be a substantive rule for which the Secretary failed to comply with notice

and comment rulemaking under the APA.

     142.     The APA, 5 U.S.C. §§ 500-576, requires that when a policy acts as a substantive

rule and alters an existing regulatory scheme, the Secretary must adopt the policy according to

procedures set for in the APA.

     143.     Although not applicable to the DGME and IME payments at issue, the billing

rules established under 42 C.F.R. § 424.44 were promulgated through notice and comment

rulemaking.

     144.     The only billing "rule" for DGME and IME payments for Medicare HMO

enrollees that arguably exists is identified in the Program Memorandum and the Bulletin. These are similarly substantive rules. However, they are invalid because they impose obligations, before DGME and IME for Medicare HMO enrollees can be paid, that were not adopted pursuant to the notice and comment rulemaking provisions of the APA.

145.    The Program Memorandum and the Bulletin were not adopted pursuant to notice and comment rulemaking procedures as required by the APA, 5 U.S.C. § 553. Accordingly, they were invalid when relied upon to deny Loma Linda's DGME and IME payments.

## XI.  FOURTH CLAIM FOR RELIEF

146.    Loma Linda realleges and incorporates by reference paragraphs 1 through 145 above.

147.    In addition, if the regulations that the Secretary asserts as time limits for Loma Linda to submit DGME and IME bills did apply as a matter of law, they would not act as a bar to Loma Linda's submission of DGME data or late DGME and IME bills because Loma Linda comes within their exceptions for CMS and Fiscal Intermediary error or misrepresentation.

148.    42 C.F.R. Section 424.44 provides that timeframes for submitting Medicare claims for payments may be extended due to error or misrepresentation:

> Section 424.44(b): Extension of filing time because of error or misrepresentation.
>
> (1) The time for filing a claim will be extended if failure to meet the deadline . . . was caused by error or misrepresentation of an employee, intermediary, carrier, or agent of the Department that was performing Medicare functions and acting within the scope of its authority.

149.    CMS Pub100-4, Section 70.7 provides for an exception if there is an "administrative error."

150.    CMS Pub100-4, Section 70.7.1 then provides several "standard" exceptions,

including that "The failure resulted from excessive delay by Medicare, the [Fiscal Intermediary],

or the carrier in furnishing information necessary for the filing of the claim." Section 70.7.1 also

states that:

> Any claim involving situations other than those listed above, where
> it appears that an extension of the time limit might be justified on
> the basis of administrative error, should be submitted by the FI
> with a recommendation, before payment, to the appropriate CMS
> RO. Also, any claim, whether involving the situations listed above
> or others, in which administrative error prevented timely filing
> until after the close of the third year following the year in which
> the services were furnished (fourth year, in the case of services
> furnished in the October – December quarter) should be submitted
> to the appropriate CMS RO for advice before denial action.

Section 70.7.1 goes on to state that, "At CMS' discretion, consideration of such allegations [of

administrative error] may not be limited to the three or four year period described above."

WHEREFORE, plaintiff prays for judgment against defendant as follows:

A.    That the Court set aside the Secretary's final decision in this case and

direct the Secretary on remand to accept Loma Linda's alternative data with respect to DGME

and IME payments for Medicare managed care enrollees and reimburse Loma Linda accordingly

for the periods at issue;

B.    That the Court award plaintiff prejudgment interest that it is entitled to as

a matter of right under 42 U.S.C. § 1395oo(f)(2);

C.    That the court award plaintiff costs; and

D.    That the Court grant to plaintiff such other relief that the Court deems

proper.

Dated: August 29, 2008                    By: _____

                                          Andrew L. Hurst
                                          D.C. Bar No. 455471
                                          Andrew C. Bernasconi
                                          D.C. Bar No. 484614
                                          REED SMITH LLP
                                          1301 K Street NW
                                          Suite 1100 – East Tower
                                          Washington, DC 20005
                                          Sacramento, CA  95811-6906
                                          Telephone:   (202) 414-9200
                                          Facsimile:    (202) 414-9299
                                          ahurst@reedsmith.com
                                          abernasconi@reedsmith.com

                                          Attorneys for Plaintiff
                                          LOMA LINDA UNIVERSITY MEDICAL
                                          CENTER

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

LOMA LINDA UNIVERSITY MEDICAL CENTER, 24890 Tulip Avenue
Loma Linda, California 92354

88888

## DEFENDANTS

MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

88888

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Andrew L. Hurst, Andrew C. Bernasconi
Reed Smith LLP
1301 K Street, NW, Suite 1100 - East Tower
Washington, DC 20005
(202) 414-9200

Case: 1:08-cv-01520
Assigned To : Kennedy, Henry H.
Assign. Date : 8/29/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U S Government Plaintiff

⊙ 2 U S Government Defendant

○ 3 Federal Question
(U S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. *Antitrust*

☐ 410 Antitrust

○ B. *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

⊙ C. *Administrative Agency Review*

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E.  *General Civil (Other)*    OR    ○ F.  *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

*3*

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Review pursuant to 42 U.S.C. § 1395oo(f) of a final decision of the Secretary of the Department of Health and Human Services

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F R C P 23 | **DEMAND $** _____ <br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐  NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form

DATE  August 29, 2008   SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed  Listed below are tips for completing the civil cover sheet  These tips coincide with the Roman Numerals on the Cover Sheet

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence· Use 11001 to indicate plaintiff is resident of Washington, D C , 88888 if plaintiff is resident of the United States but not of Washington, D C , and 99999 if plaintiff is outside the United States

III. CITIZENSHIP OF PRINCIPAL PARTIES This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV. CASE ASSIGNMENT AND NATURE OF SUIT  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint  You may select only one category  You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION  Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause

VIII. RELATED CASES, IF ANY  If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form