# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **LOMA LINDA UNIVERSITY MEDICAL CENTER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KATHLEEN SEBELIUS, Secretary, United States Department of Health and Human Services,**<br><br>**Defendant.** |

Civil Action 08-01520  (HHK)

## MEMORANDUM OPINION

Loma Linda University Medical Center ("Loma Linda"), a teaching hospital, brings this action against Kathleen Sebelius[1] in her official capacity as Secretary of the U.S. Department of Health and Human Services ("Secretary").  Loma Linda seeks judicial review of the Secretary's decision to deny it certain payments, authorized by the Balanced Budget Act of 1997 ("BBA '97"), Pub. L. No. 105-33, 111 Stat. 251, for graduate medical education costs associated with providing services to Medicare beneficiaries who are members of health maintenance organizations.  Before the Court are the parties' cross-motions for summary judgment [##14, 15].  Upon consideration of the motions, the oppositions thereto, and the record of this case, the Court concludes that Loma Linda's motion should be granted in part and denied in part, the Secretary's motion should be denied, and the case must be remanded to the Secretary for further proceedings consistent with this opinion.

---

[1]      When Loma Linda filed its complaint, Michael O. Leavitt was the Secretary of the Department of Health and Human Services.  Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary, Kathleen Sebelius, is substituted as the defendant in this suit.

# I. BACKGROUND

**A.**     **Statutory and Regulatory Background**

**1.**     **Payments for Medicare Part A Services**

The Secretary, through the Centers for Medicare and Medicaid Services ("CMS"),

administers the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.

The Medicare statute consists of several parts, two of which are relevant to this action.

Part A provides health insurance to Medicare beneficiaries. *Id.* §§ 1395c, 1395d. The

Secretary contracts with private entities, referred to as "fiscal intermediaries," to oversee billing

by and payment to hospitals for the provision of health care services under Part A. *Id.* § 1395h.

Regulations governing claims for payment under Part A are set forth at 42 C.F.R. § 424.30 *et seq*.

These regulations begin by describing their scope, providing that "[c]laims must be filed in all

cases except when services are furnished on a prepaid capitation basis by a health maintenance

organization (HMO), a competitive medical plan (CMP), or a health care prepayment plan

(HCPP)." *Id.* § 424.30. For claims that do not fall under the exceptions described, the

regulations go on to set forth billing requirements.

Two provisions of the Part A regulations are particularly relevant here: 42 C.F.R. §

424.32 and 42 C.F.R. § 424.44. 42 C.F.R. § 424.32 requires hospitals to submit claims for

payment via a specific form, the Uniform Institutional Provider Bill, also called CMS-1450 or

UB-92. *Id.* § 424.32. UB-92 requires, among other information, the Health Insurance Claim

("HIC") number of each patient for whom a claim is submitted. These numbers appear on the

Medicare cards held by all Medicare beneficiaries enrolled in Part A.

2

42 C.F.R. § 424.44 sets time limits for filing claims with the fiscal intermediary. According to this section of the regulations, a hospital must submit bills by "December 31 of the following year for services that were furnished during the first 9 months of the calendar year" or by "December 31 of the second following year for services that were furnished during the last 3 months of the calendar year." *Id.* § 424.44(a). A hospital may receive a six-month extension of these deadlines if the failure to timely file claims "was caused by error or misrepresentation of an employee[ or] intermediary" acting on behalf of the Secretary. *Id.* § 424.44(b).

At the end of each fiscal year, a hospital submits a report to its fiscal intermediary listing all costs for which it seeks reimbursement and the intermediary determines which of those costs are actually due to the hospital. 42 C.F.R. §§ 405.1801(b)(1), 405.1803. The hospital may contest the intermediary's determination at a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board"). 42 U.S.C. § 1395oo(a). The Secretary may review the Board's decision, *id.* § 1395oo(f); in practice, the Administrator of CMS conducts this review on the Secretary's behalf. A hospital may seek review of the final agency decision in federal district court. *Id.*

### 2.    Medicare Part C

Medicare Part C, also called Medicare+Choice, allows Medicare beneficiaries to receive benefits through health maintenance organizations ("HMOs"). 42 U.S.C. § 1395w-21 *et seq*. Under Part C, when hospitals provide services to Medicare+Choice enrollees, they send bills to, and receive payments from, HMOs. *Id.* §§ 1395w-23, 1395mm(a). Hospitals do not receive payment from fiscal intermediaries for the provision of Part C services. CMS implemented a requirement shortly after the creation of Part C, however, that hospitals submit to intermediaries

"encounter data," or "no-pay bills," regarding services provided to Medicare+Choice enrollees. Administrative Record ("AR") 148-49.  These no-pay bills are UB-92 forms; hospitals submit them with a specific code to distinguish them from bills for Part A services.  AR 149.  In order to submit UB-92 forms for this, or any, purpose, hospitals must enter each patient's HIC number.

### 3. Payments for Graduate Medical Education Costs

In addition to paying for health care services directly, Medicare reimburses teaching hospitals for the cost of training graduate medical students, including interns and residents, in the course of providing services to Medicare beneficiaries.  There are two types of such payments: direct graduate medical education ("DGME") costs and indirect medical education ("IME") costs.  42 U.S.C. §§ 1395ww(h), 1395ww(d)(5)(B).  DGME costs include "residents' salaries and fringe benefits (including travel and lodging where applicable) and the portion of the cost of teaching physicians' salaries and fringe benefits attributable to direct graduate medical education."  42 C.F.R. § 413.75(b)(1).  Reimbursements for these costs are calculated based on the number of days Medicare patients spend in a hospital, the amount of work interns and residents perform in that hospital, and a hospital-specific rate per resident.  *See* 42 U.S.C. § 1395ww(h); AR 47.  Indirect graduate medical education (IME) expenses include "the additional tests and procedures ordered by residents as well as the extra demands placed on other staff as they participate in the educational processes."  *St. Mary's Hosp. of Rochester, Minn. v. Leavitt*, 416 F.3d 906, 909 (8th Cir. 2005) (quoting H.R. Rep. No. 98-25(I), at 140 (1983)) (internal quotation marks omitted).  Reimbursements for IME costs are calculated based on the ratio of residents to hospital beds.  42 C.F.R. § 412.105; AR 47.

Before Congress passed BBA '97, hospitals received reimbursement from the Secretary for DGME and IME costs associated only with services provided under Medicare Part A. Fiscal intermediaries pay these costs along with other Part A payments. Under BBA '97, as of January 1, 1998 the Secretary was to begin paying for medical education costs associated with services provided under Part C as well. BBA '97 §§ 4622, 4624 (codified at 42 U.S.C. § 1395ww(d)(11), (h)(3)(D)). The statute did not explain how or from what entity hospitals should request, or how or from whom they would receive, these new payments.

The Secretary issued a "final rule with comment period" on August 29, 1997 that addressed the new payments. Changes to the Hospital Inpatient Prospective Payment Systems & Fiscal Year 1998 Rates, 62 Fed. Reg. 45,966 (proposed Aug. 29, 1997). The proposed rule stated that the Secretary "must make payments to teaching hospitals" for DGME and IME costs and described the basic formulas by which such costs are calculated. *Id.* at 45,968-69. The proposed rule did not explain how the Secretary would collect pertinent information from teaching hospitals such that those hospitals could receive payment.

On May 12, 1998, after receiving comments regarding the August 29, 1997 proposal, the Secretary issued a final rule ("May 12, 1998 rule"). Changes to the Hospital Inpatient Prospective Payment Systems & Fiscal Year 1998 Rates, 63 Fed. Reg. 26,318 (May 12, 1998). In a section discussing medical education costs associated with Part C services, the rule described comments that contained suggestions of possible sources of the data necessary to calculate payments. *Id.* at 26,341-42. In response, the rule stated:

> Under section[s] 4622 and 4624 of the BBA, teaching hospitals may receive indirect and direct GME payments associated with Medicare+Choice discharges. Since publication of the final rule with comment on August 29, 1997, we have

> consulted with hospitals, managed care plans, and fiscal intermediaries for purposes of developing a process to implement these provisions.
>
> We anticipate teaching hospitals will need to submit claims associated with Medicare+Choice discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments. When the claims are processed, the fiscal intermediaries will make the IME payment associated with a Medicare+Choice discharge directly to the teaching hospital.

*Id.* at 26,342.

On July 1, 1998, CMS issued a Program Memorandum, numbered A-98-21 and titled "Direct Costs of Graduate and Operating Indirect Medical Education" ("PM A-98-21"). AR 1737. CMS sent PM A-98-21 to fiscal intermediaries. This document explained that hospitals would begin to receive DGME and IME payments for Medicare Part C beneficiaries and stated that "hospitals must submit a claim to the hospitals' regular intermediary in UB-92 format, with condition codes 04 and 69." *Id.* Condition code 69 "is a new code . . . to indicate that the claim is being submitted for operating IME payment only." *Id.*[2] The memorandum directed intermediaries to notify hospitals of these reporting requirements. AR 1738.

Loma Linda's fiscal intermediary sent out a bulletin, dated July 13, 1998 ("Bulletin"), with information derived from PM A-98-21. AR 1740. Under the heading "IME Costs," the Bulletin stated: "For services provided to Medicare + Choice beneficiaries, beginning with discharges on or after July 1, 1998, providers may not submit HMO paid claims (no pay bills) to

---

[2]    PM A-98-21 did not explain the significance of condition code 04. It is apparent from elsewhere in the record that condition code 04 indicates to the intermediary that the UB-92 form on which it appears is a no-pay bill reporting, but not requesting payment for, the provision of services to Part C beneficiaries.

their intermediary.  Teaching hospitals may submit bills for inpatient stays by managed care

enrollees for payment of IME." *Id.*[3]

**B.     Factual and Procedural History**

**1.     Loma Linda's Rejected Request for Payment**

Loma Linda is a teaching hospital in California that provides services to Medicare

beneficiaries.  Compl. ¶ 8.  The parties do not dispute that Loma Linda was eligible for payment

of DGME and IME costs associated with services provided to Medicare+Choice beneficiaries in

1998, 1999, and 2000.  Nor do they dispute that Loma Linda requested and received

reimbursements for some of those costs during those years.

Loma Linda was unable to submit claims for medical education costs associated with

some Medicare Part C beneficiaries, however, because the hospital did not have those patients'

HIC numbers.  In contrast to the cards Part A beneficiaries present upon registration at a hospital,

insurance cards of beneficiaries enrolled in Part C do not include HIC numbers.  Loma Linda

made efforts to collect HIC numbers from Medicare Part C enrollees.  The hospital asked

patients for their HIC numbers when they registered at the hospital, by telephone, and by letter;[4]

it also tried to obtain HIC numbers from the "Common Working File," a Medicare database.

Although Loma Linda was successful in some cases, it was not successful in all cases.  A

---

[3]     BBA '97 directed that the new DGME and IME payments begin January 1, 1998, but the intermediary—following a directive in PM A-98-21—did not accept requests for payment for services provided before July 1, 1998.  Though the parties raised this issue before the PRRB, *see* AR 93-94, they have not addressed it in this action.

[4]     Medicare+Choice patients may have been hesitant to disclose their HIC numbers to Loma Linda because they had been warned that doing so could lead to fraud or double billing. AR 144-45.

Medicare billing manager at Loma Linda, Ruth DePaepe, called the intermediary to seek assistance with this problem, but she was told only that the submission of bills—which, as explained, requires HIC numbers—was necessary for payment.  AR 154.

In 2003, Loma Linda hired an outside auditor for purposes of resolving a Medicare billing issue not relevant here.  The auditor discovered that in many cases in 1998, 1999, and 2000, Loma Linda had not filed for or received DGME and IME payments for Medicare+Choice enrollees.[5]  The auditor compiled data regarding these unbilled claims and, in February 2003, Loma Linda sent information regarding services provided in 2000 to its fiscal intermediary.  AR 1747.  This letter asked for instruction as to how to receive reimbursement for these claims.  The fiscal intermediary rejected this request for payment, responding in a March 2003 letter that Loma Linda had not properly billed for the claims identified.  AR 1752.  The intermediary also stated that even were Loma Linda to submit proper bills, by which it presumably meant UB-92 forms, any claims submitted in 2003 would be rejected as untimely because "the 18 months time limitation to submit these claims for payment already expired."  *Id.*  The auditor then contacted CMS on Loma Linda's behalf and received an email stating:

> The filing of the managed care no-pay bills for the purpose of using those managed care days in the determination of indirect medical education (IME) payments are treated as a regular Medicare claim.  The claims are to be submitted timely.  There are provisions for extending the time for filing but [those] are very restrictive.

AR 1754.

---

[5]     In 1998, Loma Linda billed for medical education costs associated with 10,032 days of care provided to Medicare+Choice beneficiaries; the hospital had failed to bill for 13,077 days.  In 1999, Loma Linda billed for 11,506 days but failed to bill for 9,467 eligible days.  In 2000, the figures of billed and unbilled days are 13,977 and 6,615, respectively.  AR 62.  Although the parties dispute whether the inability to obtain HIC numbers explains all of the unbilled claims, it is clear from the record that the missing numbers account for at least some of them.

In January 2006, Loma Linda made a renewed request for payment for the unbilled claims from 1998, 1999, and 2000.  AR 1678.  This new request asked that the fiscal intermediary use the information provided by Loma Linda, rather than requiring UB-92 forms, to calculate the payments due.  It is from this request that Loma Linda brought a timely appeal to the PRRB.  *See* AR 183.

### 2.  PRRB Hearing and Decision

Loma Linda received a hearing before the PRRB in February 2006.  DePaepe testified on behalf of Loma Linda.  AR 140.  The Board's questions to her, and accordingly her answers, largely related to Loma Linda's difficulty obtaining the HIC numbers necessary to submit UB-92 forms for Medicare+Choice enrollees.  AR 140-57.  The Board did not direct any questions to her regarding deadlines or timeliness.  Joseph Fass, the auditor Loma Linda had hired, then testified as to how he determined that Loma Linda had failed to bill the intermediary for the relevant claims and what steps he took to assist the hospital in requesting additional payment.  AR 157-83.  He explained his belief that the information provided to the fiscal intermediary, though not in the required UB-92 format, was sufficient to calculate the medical education costs owed.  AR 163, 175-76.  Finally, Cheryl Johnson, an employee of Fass's company, testified about the calculation of the dollar amounts at issue.  AR 185-87.

The PRRB ruled in Loma Linda's favor, concluding that the hospital's fiscal intermediary "improperly disallowed" Loma Linda's request for payment for additional DGME and IME costs for the three years in question.  AR 54.  The majority of the Board concluded that CMS should have announced by regulation the system for requesting DGME and IME payments associated with Part C services.  The opinion reasoned that only a new regulation could properly change the exception in 42 C.F.R. § 424.30 for "services . . . furnished . . . by a[n HMO]" to establish that it

9

would not apply to bills for medical education costs even though those costs are associated with the excepted services.  42 C.F.R. § 424.30; AR 53.  The Board wrote that "[i]f the regulatory obligation to file a 'claim' is to be bifurcated so that a provider has an obligation to file its claim for payment of services to the beneficiary with the HMO and also to file a virtually identical claim to the Intermediary, then . . . a regulatory notice is required."  AR 54.  Because CMS had not complied with this requirement, the Board held that Loma Linda could not be deprived of its statutory right to payment for these costs.  AR 53-54.

Next, the PRRB reasoned that even if "CMS could implement the claims requirement without regulatory change," two findings supported the conclusion that Loma Linda was entitled to submit untimely bills.  AR 54.  First, the Board believed the instructions provided to hospitals were confusing; *inter alia*, the Bulletin addressed only IME, not DGME, payments; it did not specify dates when billing could begin; and it stated that hospitals "may" bill intermediaries, not that they were required to do so.  *Id.*  Second, the Board found that requiring hospitals to submit bills with HIC numbers without ensuring that hospitals could obtain HIC numbers was erroneous.  *Id.*

One Board member dissented, writing that she would have rejected Loma Linda's request for payment.  She believed that CMS notified the public of the new medical education payments for Medicare HMO enrollees in the August 29, 1997 proposed rule.  AR 56 (citing 62 Fed. Reg. at 45,968-69).  She also believed that PM A-98-21 sufficiently instructed intermediaries to inform hospitals "of the right to request the additional payments and the means by which the payments could be secured."  *Id.*  As to 42 C.F.R. § 424.30, she concluded that because education costs are not "services," they are not included in the exception from the regulations governing Part A payments.  *Id.*  Furthermore, PM A-98-21 was an "efficient" way to notify

teaching hospitals of the change, and Loma Linda was, as evidenced by its successful submission

of some DGME and IME bills, aware of the proper procedures for requesting payment.  AR 57.

The dissenter rejected Loma Linda's argument regarding HIC numbers because she believed the

HIC number requirement was not the cause of Loma Linda's late request for additional

payments.  *Id.*

        **3.**      **Administrator's Decision**

After receiving comments from CMS and Loma Linda, the CMS Administrator issued a

twenty-page decision reversing PRRB's decision.  AR 2.  The Administrator began by describing

the PRRB's majority opinion and accompanying dissent.  AR 2-6.  Next, the Administrator

summarized the comments CMS and Loma Linda had submitted.  AR 6-10.  In the opinion's

"Discussion" section, the Administrator described the history of calculation of medical education

payments under Medicare.  AR 10-12.  The Administrator quoted provisions of BBA '97, and

corresponding regulations amended to comport with that statute, that called for paying hospitals

for DGME and IME costs associated with Medicare+Choice enrollees.  AR 12-14.  Next, the

Administrator quoted at length from the Secretary's May 12, 1998 rule.  AR 15.

The Administrator then quoted from PM A-98-21, emphasizing that document's

explanation that "hospitals must submit a claim to the hospitals' regular intermediary in UB-92

format."  AR 16.  He wrote that "[t]he submission of claims to intermediaries in the UB-92

format, for, *inter alia*, Part A payment, is controlled by the regulation at 42 CFR § 424.30."  *Id.*

After quoting the language of that regulation, he concluded: "[t]herefore, while claims for, *inter*

*alia*, Part C and [other statutorily defined] managed care services are not controlled by this

section, a hospital must submit claims in conformity with 42 CFR § 424.30, *et seq.*, to be able to

include managed care enrollees for the Part A IME and DGME payments from its intermediary."

*Id.*  As a result of concluding that 42 C.F.R. § 424.30 applied to these new payments, the

Administrator also concluded that the time limits in 42 C.F.R § 424.44 governed requests for

Part C medical education payments.  AR 16-17.

The opinion then stated that "using the UB-92 form is required in order to generate data

that may be used for payment."  AR 17.  The Administrator explained that "CMS provides each

intermediary a standard Provider Statistical & Reimbursement ("PS&R") system to interface

with billing form CMS 1450 (UB-92 form)."  *Id.*  PS&R "provides reports to be used in

developing and auditing [hospital] cost reports," which include calculations of DGME and IME

costs.  *Id.*

The Administrator then noted that Loma Linda had submitted timely claims for thousands

of days during which it provided care to Medicare HMO enrollees in 1998, 1999, and 2000.  AR

18.  He found that payment for medical education costs associated with Medicare+Choice

enrollees "is within the framework of a pre-existing methodology for IME and DGME payments"

which "requires that claims be made to the intermediary in order to generate a payment."  *Id.*  He

stated that "[t]he provider community was given notice of this procedure" through the May 12,

1998 rule, PM A-98-21, and the July 13, 1998 Bulletin.  AR 18-19.

In conclusion, the Administrator repeatedly stated that no new regulation was required to

implement the system contemplated by PM A-98-21.  He wrote that it was reasonable to require

submission of bills in the standard Part A format:

> The only exception to the claims processing requirements at 42 CFR § 424.30 is
> for services furnished on a prepaid capitation basis to the beneficiary by a
> managed care plan, which is not at issue here.  The claims in the instant case were
> claims that were required to be process[ed] under the claims processing system in
> order for payment to be made for an established reimbursement methodology for
> hospitals' costs associated with being a teaching hospital and not for the services
> furnished to [] managed care enrollees.

AR 19-20.

In a single paragraph, the Administrator rejected Loma Linda's argument that the inability

to collect HIC numbers was the cause of its missing claims, writing that "the record is not

substantially supportive of [Loma Linda']s argument that the failure to file claims was due to the

lack of HIC numbers."  AR 21.

The Administrator also addressed in one paragraph Loma Linda's request that the

intermediary use the data as provided by Loma Linda rather than requiring UB-92 forms to

calculate the unbilled payments.  He wrote that accepting information in the form provided "is

not reasonable," explaining that doing so "cannot accurately duplicate the role of the claim

processing system," "would result in inaccurate payments," and "would entail substantial

burden."  *Id.*

The Administrator's opinion "constitutes the final administrative decision of the

Secretary."  AR 22.  Loma Linda filed this action seeking its reversal.

## II. LEGAL STANDARD

### A.    APA Review

The parties agree that, pursuant to 42 U.S.C. § 1395oo(f)(1), the Court reviews this

agency decision under the deferential standard provided in the Administrative Procedure Act, 5

U.S.C. § 701 *et seq.* ("APA").

Pursuant to the APA, a "reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419

U.S. 281, 284 (1974) (quoting 5 U.S.C. § 706(2)(A)).  In conducting this review, a court is to

ensure that the deciding body has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choices made." *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Maint.*, 476 F.3d 946, 952 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one'" and reversal is appropriate only where "there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Where an agency has drawn conclusions based on an evidentiary hearing, its findings must be supported by "substantial evidence." *JSG Trading Corp. v. Dep't of Agric.*, 235 F.3d 608, 611 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(E)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' when taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996)).[6]

A court's review is limited to the administrative record and the grounds for decision invoked by the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Ass'n of Data Processing Serv. Orgs., Inc., v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (noting that "in the case of formal proceedings the factual support must be found in the closed record as opposed to elsewhere").

---

[6]     The D.C. Circuit has explained that "the distinction between the arbitrary and capricious standard and substantial evidence review is largely semantic." *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1146 n.29 (D.C. Cir. 2008) (quoting *Pac. Legal Found. v. Dep't of Transp.*, 593 F.2d 1338, 1343 n.35 (D.C. Cir. 1979)). "[S]crutiny of even the most complex evidentiary issues is not inconsistent with the deferential standard of review, so long as the purpose of such scrutiny is to enable the court to better understand the issues before the agency." *Id.*

**B.**     **Summary Judgment**

Summary judgment is the proper mechanism for deciding, as a matter of law, whether an

agency action is supported by the administrative record and consistent with the APA standard of

review.  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citing

*Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  Courts are not to apply typical

summary judgment standards, however, when reviewing a final action of an administrative

agency under the APA:

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is
> appropriate when the pleadings and the evidence demonstrate that "there is no
> genuine issue as to any material fact and that the moving party is entitled to
> judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In a case involving review of
> a final agency action under the [APA], however, the standard set forth in Rule
> 56(c) does not apply because of the limited role of a court in reviewing the
> administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90
> (D.D.C. 2006).  Under the APA, it is the role of the agency to resolve factual
> issues to arrive at a decision that is supported by the administrative record,
> whereas "the function of the district court is to determine whether or not as a
> matter of law the evidence in the administrative record permitted the agency to
> make the decision it did."  *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70
> (9th Cir. 1985); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d
> 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency
> determination under the [APA]; therefore, resolution of th[e] matter does not
> require fact finding on behalf of this court.  Rather, the court's review is limited to
> the administrative record.").

*Id.*  Accordingly, in reviewing the cross-motions for summary judgment, the Court evaluates

whether the evidence in the administrative record supports the conclusion of the CMS

Administrator that Loma Linda was not entitled to payment for previously unbilled medical

education costs associated with services provided to Medicare+Choice enrollees.

## III. ANALYSIS

**A.**   **The Administrator's Determination that Loma Linda Had Notice of the Billing Deadlines is Not Supported by Substantial Evidence in the Record.**

Loma Linda argues that it did not have sufficient information to properly bill for DGME and IME payments associated with Part C services because none of the documents containing notification of billing requirements—the May 12, 1998 rule, PM A-98-21, and the July 13, 1998 Bulletin—established a time limit for filing those claims. Loma Linda does not explain what legal effect it believes this lack of notice has, but the Court infers that Loma Linda intends to indicate that it renders the Administrator's decision arbitrary and capricious or unsupported by substantial evidence.

The Secretary responds by insisting that Loma Linda knew of the deadline for submitting the bills at issue here. The Secretary asserts that Loma Linda's timely filing of UB-92 forms requesting payment for medical education costs associated with tens of thousands of days of services provided to Medicare HMO enrollees demonstrates this knowledge. The Secretary reasons that "failures in [Loma Linda]'s internal record-keeping," rather than any notice problem, were the cause of the unbilled claims.

The Court is mindful of its obligation to apply the APA's deferential standard, overturning an agency's decision only where there is no "rational connection between the facts found and the choice made." *Frizelle v. Slater*, 111 F.3d 172, 176-77 (D.C. Cir. 1997) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)). But after careful consideration of the Administrator's decision and the evidence in the record, the Court has determined that the

Administrator's conclusion that Loma Linda had notice of the deadline for filing DGME and IME bills for costs associated with Part C services cannot be sustained.

The Administrator's decision did not reject Loma Linda's notice argument by stating that the May 12, 1998 rule, PM A-98-21, or the Bulletin explicitly put Loma Linda on notice of the deadline for filing the bills at issue.  He could not reasonably have so concluded, because Loma Linda is correct that there is no language in any of those documents regarding time limits, nor is there any mention of 42 C.F.R. § 424.44, the regulation governing deadlines for Part A claims. Nor did the Administrator identify any other agency publication informing hospitals that bills for DGME and IME costs associated with Medicare+Choice enrollees were subject to Part A regulations generally or to the deadlines in 42 C.F.R. § 424.44 in particular.  The Administrator's opinion instead maintains that the May 12, 1998 rule, PM A-98-21, and/or the Bulletin *implicitly* put Loma Linda on notice.  The Court cannot accept this conclusion.

The Administrator reasoned that requiring hospitals to submit UB-92 forms indicated that the Part C medical education payments would fall under the Part A regulations.  AR 16.  He wrote, after quoting PM A-98-21's statement that "hospitals must submit a claim to the hospitals' intermediary in UB-92 format":

> The submission of claims to intermediaries in the UB-92 format, for, *inter alia*, Part A payment, is controlled by the regulation at 42 C.F.R. § 424.30.
> . . . Therefore, while claims for, *inter alia*, Part C and [other] managed care services are not controlled by this section, a hospital must submit claims in conformity with 42 C.F.R. § 424.30, *et seq.*, to be able to include managed care enrollees for the Part A IME and DGME payments from its intermediary.

*Id.* The Administrator's logic is flawed. It is true that, according to CMS regulations, hospitals'

bills for Part A payments must be submitted as UB-92 forms. 42 C.F.R. § 424.32.[7] But it does

not follow that UB-92 forms can only be used for Part A payments. The Part A regulations do

not so state. Furthermore, it is apparent from the record that before 1998, hospitals used UB-92

forms as no-pay bills for reporting services provided under Part C.[8] It may well be within the

authority of CMS to decide to categorize requests for the new medical education payments as

Part A claims, but the agency did not inform hospitals of this decision.[9] As far as the Court can

ascertain from the record before it, Loma Linda first learned of the filing deadlines when it

sought payment for unbilled claims and was informed by the intermediary and CMS that the

request was untimely.[10] Thus the conclusion that Loma Linda should have inferred earlier that 42

---

[7]    This regulation provides that "[a] claim must be filed with the appropriate intermediary or carrier on a form prescribed by CMS." 42 C.F.R. § 424.32(a). It further provides that "CMS-1450," or the "Uniform Institutional Provider Bill"—which is the UB-92 form, *see* AR 17—is the "prescribed form[] for claims" by an "institutional provider billing for Medicare inpatient, outpatient and home health services." *Id.* § 424.32(b).

[8]    At the PRRB hearing, DePaepe, the Loma Linda employee who oversees Medicare billing for the hospital, told the PRRB that the no-pay bills previously submitted for Part C services were identical to the newly required UB-92 forms except for the condition code indicating a request for payment for medical education costs. AR 149. The Court notes that there appears to be no evidence in the record that the no-pay bills for Part C services were subject to the deadlines set in the Part A regulations.

[9]    It may also be that treating DGME and IME payments for costs associated with Part C services in the same manner as DGME and IME costs associated with Part A services is the best way to ensure accurate data collection and payment calculations. But the Court is not reviewing the merits of such a decision; the issue presented is whether hospitals were made aware of the billing requirements such that they could be expected to comply with them.

[10]   Loma Linda's February 2003 letter to the intermediary stated that the hospital had identified unbilled claims and sought instruction on how to submit them for reimbursement. AR 1747. It does not mention timeliness. The intermediary's March 2003 response indicated that the claims, even if properly submitted, "will be rejected for timeliness" because "the 18 months

C.F.R. § 424.44 applied is "arbitrary and capricious" and "unsupported by substantial evidence." *Frizelle*, 111 F.3d at 176.

Because the Court is bound to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Dickson*, 68 F.3d at 1404 (quoting *Bowman Transp., Inc.*, 419 U.S. at 286), the Court has searched the Administrator's decision for other rationales that might support its conclusion.  The Court has gleaned three additional rationales from the opinion, but none persuade the Court that the decision should be affirmed.

First, the Administrator seems to reason that Loma Linda knew that the medical education cost payments associated with Part C services were administered according to the "pre-existing methodology" for requesting DGME and IME payments associated with Part A services. AR 18.  He wrote that hospitals "were given notice of this procedure" through the May 12, 1998 rule, PM A-98-21, and the Bulletin.  AR 18-19.  But again, the Administrator's logic requires hospitals to infer information not provided.  The publications give instructions regarding bills for medical education costs associated with Part C services.  It is true that hospitals were already requesting and receiving payments for medical education costs associated with Part A services. But those requests and payments were made via the same billing and reimbursement system through which hospitals were paid for those Part A services.  The new payments were associated with Part C services for which bills went to HMOs; payment from the intermediary was only for DGME and IME costs.  The publications do not indicate that DGME and IME costs associated

---

time limitation to submit these claims for payment already expired."  AR 1752.  The letter did not identify the source of this time limit.  The email the auditor later received from CMS stated that "no-pay bills for the purpose of" requesting DGME and IME payments "are treated as a regular Medicare claim" and proceeded to explain, without citation to the regulation, the provisions in 42 C.F.R. § 424.44 that allow, in limited circumstances, for late filing.  AR 1754.

with Part C services were to be treated like other medical education costs rather than like other

Part C costs.  The Administrator has cited no evidence in the record to support the contention

that Loma Linda was notified of that categorization.

Second, the Administrator concludes that DGME and IME payments do not fall under the

exceptions identified in 42 C.F.R. § 424.30 and therefore the claims at issue are subject to the

Part A regulations.  The Administrator states that the exception for services furnished by an

HMO "is not at issue here," offering as further explanation only that "[t]he claims in the instant

case were claims . . . for payment to be made . . . for [] costs associated with being a teaching

hospital and not for services furnished to managed care enrollees."  AR 20.  But the

Administrator has not explained how Loma Linda could have been aware, years before his

decision was issued, that he would interpret the agency's regulations in this manner.  Again, bills

for medical education costs associated with services provided under Part C do not so obviously

fall under Part A regulations that hospitals should have intuited this outcome.  The majority of

the PRRB read the regulation the opposite way.[11]  Neither the May 12, 1998 rule, PM A-92-21,

---

[11]     The Board opinion states that "[w]hen the additional payment for IME/DGME
was authorized by the BBA '97, it did not change the nature of the payment for 'services
furnished.'  Rather, the IME/DGME payment arises from 'services . . . furnished on a . . .
capitation basis . . .' for which filing a claim with the intermediary is excepted under 42 C.F.R. §
424.30."  AR 53 (emphasis removed).

       In addition, when reviewing the denial of a different hospital's request for payment for
medical education costs associated with Part C services in another case, this Court, Judge Bates,
agreed that the Administrator's explanation of this point—identical to the language in the
Administrator's decision in this case—did not overcome the inherent connection between the
new DGME and IME payments and Part C services.  *See Cottage Health Sys. v. Sebelius*, 631 F.
Supp. 2d 80, 99 (D.D.C. 2009) ("But this characterization is debatable and merits at least some
discussion.  Indeed, the additional IME/[D]GME payment authorized by BBA '97 *was* designed
to reimburse teaching hospitals for the costs of graduate medical education incurred while
furnishing services to managed care enrollees."  (emphasis in original)).

nor the Bulletin stated that DGME and IME payments associated with services under Part C were not services exempted from Part A regulations.  There is no evidence in the record that any other publication so informed Loma Linda.

Third, the Secretary now puts great weight on another rationale the Administrator did not discuss at length: that Loma Linda successfully filed thousands of timely bills for medical education costs associated with Medicare+Choice enrollees.  The Administrator wrote that "[t]he record supports a finding that [Loma Linda]'s failure to file timely claims was not because of confusion or the lack of notice."  AR 20.  But neither the Administrator's decision nor the Secretary's filings to this Court identify any evidence in the record that Loma Linda was aware of the deadline for filing.  Some of Loma Linda's claims were submitted within the time limits of 42 C.F.R. § 424.44, and others were not.  Although the later claims were discovered in an unrelated audit, it does not follow that Loma Linda knew of the deadline CMS had imposed.  The Court cannot determine on the basis of the record before it that the Administrator's conclusion is based on "a rational connection between the facts found and the choices made."  *Kennecott Greens Creek Mining*, 476 F.3d at 952 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).[12] Consequently, the Administrator's determination that Loma Linda's payments were properly rejected as untimely is reversed.

---

[12]     Because the Court finds that the record does not support the contention that the agency put Loma Linda on notice of its decision regarding the applicability of the Part A regulations, it need not address other arguments Loma Linda raises in its motion for summary judgment.  Loma Linda argues that (1) the decision to treat DGME and IME payments for Part C services as subject to Part A regulations constituted a substantive, rather than interpretative, rule and (2) 42 C.F.R. § 424.30 is "not reasonably susceptible" to the Administrator's interpretation of it.  Pl.'s Mot. for Summ. J. at 23-26.  The Court has, in agreeing with Loma Linda's notice argument, effectively concluded that the agency did not announce such a rule.  Thus there is no need to categorize or otherwise review it.

Because the Court reverses the Administrator's conclusion that Loma Linda's request for payment was subject to the Part A regulations, his additional conclusion that "the record is not substantially supportive of [Loma Linda]'s argument that the failure to file claims was due to the lack of HIC numbers," AR 21, is invalidated. Because Loma Linda's delay in filing is not a basis for rejecting the hospital's claims, the reason or reasons for that delay are not relevant to the outcome of the request for payment.

**B.      The Administrator Did Not Offer Sufficient Explanation or Citation to the Administrative Record for the Court to Review its Rejection of Loma Linda's Request to Submit Bills in an Alternative Format.**

Having reversed the Administrator's approval of the rejection of Loma Linda's request for payment on timeliness grounds, the Court must next turn to the Administrator's conclusion that Loma Linda can nevertheless not receive payment because it submitted information to its intermediary in an inappropriate form.

Loma Linda argues that the Administrator's rejection of the hospital's request for payment based on the form of the data submitted—*i.e.*, because Loma Linda did not submit UB-92 forms—was arbitrary and capricious. Loma Linda first asserts that the agency has a duty to "consider responsible alternatives to its chosen policy." Pl.'s Mot. for Summ. J. at 31 (quoting *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). Loma Linda also contends that the data it provided to the intermediary was "sufficient for calculating the IME and DGME payments" and contained "the same information as included on the UB-92 claim form." *Id.* at 32, 34. In addition, Loma Linda asserts that the intermediary had informed the hospital that "use of this PS&R"—Provider Statistical & Reimbursement, the reporting system

that draws information from UB-92 forms, AR 17—is not mandatory.  Pl.'s Mot. for Summ. J. at

32 (quoting AR 829).[13]

The Secretary rejoins that the agency considered alternatives before deciding that

hospitals were to submit UB-92 forms to fiscal intermediaries, quoting statements from the May

12, 1998 rule regarding the agency's consultation with various actors "for purposes of developing

a process to implement [the new medical education costs payments]."  Def.'s Cross-Mot. for

Summ. J. at 24 (quoting 63 Fed. Reg. at 26,342).  According to the Secretary, Loma Linda is

seeking, and is not entitled to, reconsideration of alternatives where consideration has already

occurred.

The Court notes first that it is prohibited from taking into account the Secretary's

argument here.  APA review "demands evidence of reasoned decisionmaking *at the agency level*;

agency rationales developed for the first time during litigation do not serve as adequate

substitutes."  *Kansas City v. Dep't of Housing & Urban Dev.*, 923 F.2d 188, 192 (D.C. Cir. 1991)

(citing *Citizens to Preserve Overton Park*, 401 U.S. at 419); *see also Nat'l Ass'n for Better*

*Broadcasting v. F.C.C.*, 830 F.2d 270, 278 n.57 (D.C. Cir. 1987) ("Post-hoc explanations of

agency counsel, however compelling, cannot supply the agency's rationale for its decision."

(citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50)).  The Administrator did not conclude that he

---

[13]     Loma Linda also argues that the agency's decision to require the filing of UB-92 forms with fiscal intermediaries violates the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*. Loma Linda did not raise this issue at the administrative level, either before the PRRB or in the comments it submitted to the CMS Administrator, *see* AR 23-34, 85-108, and the agency made no determination as to its compliance with the Act.  Consequently, the Court will not consider Loma Linda's argument now.  *See Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."  (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952))).

was not obligated to consider alternatives to the submission of data in the UB-92 format.  The

Court may only review the rationale he did provide: he wrote that Loma Linda's request that the

intermediary accept alternative data was "not reasonable" because "use of [Loma Linda]'s

internal logs does not meet the payment standards in place for intermediaries and cannot

accurately duplicate the role of the claim processing system" and added that "[a] manual

computation of the IME and DGME payments would result in inaccurate payments and would

entail substantial burden."  AR 21.

This reasoning is not sufficiently developed for the Court to conduct the necessary

review.  Though an agency's decision need not "be a model of analytic precision to survive a

challenge," APA review does require that the agency "provide an explanation that will enable the

court to evaluate the agency's rationale at the time of the decision."  *Dickson*, 68 F.3d at 1404

(quoting *Bowman Transp., Inc.*, 419 U.S. at 286; *Pension Benefit Guar. Corp. v. LTV Corp.*, 496

U.S. 633, 654 (1990)).  Loma Linda argued in its comments to the Administrator, as it has to this

Court, that the information it provided is identical to the data that would be included in UB-92

forms.  The Administrator did not refute this contention; instead, he decided that the

complications arising from receiving the data in a form other than the one designed to "interface

with" the PS&R system were too great.  AR 17.  The Administrator's explanation of the PS&R

system, which generates reports "used in developing and auditing [hospital] cost reports,"

included no citation to the record.  AR 17.  The parties have not identified, and the Court has not

located,[14] any evidence in the record pertinent to the assessment of how much labor is involved

---

[14]      The Court further notes that is not obligated to conduct an intensive search of the
6,658-page record before it to seek out support for the agency's decision.  *See City of Brookings*,
822 F.2d at 1168 ("[I]t is not the task of a reviewing court to 'rummage' through the record in

in, or how much inaccuracy is likely to result from, inputting data not provided as UB-92 forms.

Furthermore, the Administrator offered no response to Loma Linda's contention that a letter it

received from its intermediary indicated that "use of [the] PS&R is not mandatory" and "in

certain instances you may elect to use your records in part or in total in filing the cost report."

AR 31, 829.

When "the record before the agency does not support the agency action . . . or if the

reviewing court simply cannot evaluate the challenged agency action on the basis of the record

before it, the proper course, except in rare circumstances, is to remand to the agency for

additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744

(1985)). Therefore, this case is remanded to the Secretary for further explanation of or

investigation into whether, given that timeliness is not a legitimate basis for refusing payment to

Loma Linda, the fiscal intermediary is able to process Loma Linda's request.

### IV. CONCLUSION

For the foregoing reasons, Loma Linda's motion for summary judgment [#14] is granted

except insofar as it seeks reversal of the Administrator's decision that Loma Linda may not

submit requests for payment in alternative format, the Secretary's cross-motion for summary

judgment [#15] is denied, and the case is remanded to the Secretary for further proceedings

consistent with this memorandum opinion. An appropriate order accompanies this memorandum

opinion.

Henry H. Kennedy, Jr.
United States District Court

_____

search of a basis for upholding the [agency]'s conclusion." (quoting *Conn. Power & Light Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 534-35 (D.C. Cir. 1982))).